CHARLES M. TEBBUTT, WSBA #47255
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St.
Eugene, OR 97401
Tel: 541.344.3505
charlie@tebbuttlaw.com

*Additional Counsel Identified on Signature Page*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| COMMUNITY ASSOCIATION FOR RESTORATION OF THE ENVIRONMENT, INC., a Washington non-profit corporation<br><br>*and*<br><br>FRIENDS OF TOPPENISH CREEK, a Washington non-profit corporation,<br><br>   Plaintiffs,<br><br>*v.*<br><br>SPRING CANYON RANCH, LLC, a Washington limited liability company,<br><br>   Defendant. | Case No. _____<br><br><br>COMPLAINT |

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

### **INTRODUCTION**

1. This is a citizen suit for declaratory and injunctive relief against Defendant Spring Canyon Ranch, LLC (hereinafter "SCR" or "the Dairy") for violations of the Solid Waste Disposal Act, also known as the Resource Conservation and

COMPLAINT                            1

Recovery Act, 42 U.S.C. § 6901 *et seq*. ("RCRA"), at Defendant's dairy facilities located at or near 165 Isaacs Road, Outlook, WA 98938.

2.     This civil action is brought pursuant to the citizen suit provisions of RCRA, 42 U.S.C. § 6972(a)(1) (A) and (B).

3.     As detailed below, Plaintiffs allege that SCR has violated and continues to violate Section 7002(a) of RCRA by contributing to the past and present handling, storage, treatment, transportation, and/or disposal of solid and hazardous waste in such a manner that may present an imminent and substantial endangerment to health and the environment. 42 U.S.C. § 6972(a).

4.     Plaintiffs further allege that SCR employs improper manure management practices that constitute the "open dumping" of solid waste in violation of Section 4005(a) of RCRA, 42 U.S.C. § 6945(a).

5.     Plaintiffs seek declaratory relief establishing that SCR has violated RCRA. Plaintiffs also seek injunctive relief directing SCR to modify their handling, storage, treatment, transportation, and disposal of solid and hazardous waste such that these practices no longer present an imminent and substantial endangerment to health and the environment. Additionally, Plaintiffs seek injunctive relief obligating SCR to remediate the environmental contamination it has caused and/or contributed to, including widespread soil and groundwater contamination. Finally, Plaintiffs request that the Court award Plaintiffs their reasonable attorneys' and

expert witnesses' fees, and costs, incurred in bringing this action.

## JURISDICTION

6.      This Court has subject matter jurisdiction over this lawsuit pursuant to Section 7002(a) of RCRA, 42 U.S.C. § 6972(a).

7.      The Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under RCRA and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.

8.      On February 8, 2017, Plaintiffs gave notice of the violations and their intent to file suit to the Defendant, Defendant's registered agent, United States Attorney General, United States Environmental Protection Agency (EPA), EPA Region X, Washington State Office of the Governor, Washington State Office of the Attorney General, and Washington State Department of Ecology as required by Section 7002(a) of RCRA, 42 U.S.C. § 6972(b).  A copy of notice letter is attached hereto as Exhibit A and incorporated by reference.

9.      On April 29, 2019, Plaintiffs gave supplemental notice of the violations and their intent to sue Defendant, Defendant's registered agent, United States Attorney General, United States Environmental Protection Agency (EPA), EPA Region X, Washington State Office of the Governor, Washington State Office of the Attorney General, and Washington State Department of Ecology as required by Section 7002(a) of RCRA, 42 U.S.C. § 6972(b). A copy of notice letter is attached hereto

1    as Exhibit B and incorporate by reference.

2    10.    More than ninety days have passed since notice was served, and the

3    violations complained of in the notice are continuing at this time, or Defendant is

4    reasonably likely to continue to remain in violation of RCRA. Neither the EPA nor

5    the State of Washington has commenced or is diligently prosecuting a civil or

6    criminal action to redress the violations.

7                                        **VENUE**

8    11.    Venue properly vests in this Court pursuant to Section 7002(a) of RCRA, 42

9    U.S.C. §  6972(a), because the alleged violations of the aforementioned statutes

10    occurred and continue to occur within the Eastern District of Washington.

11                                       **PARTIES**

12    12.    Upon information and belief, SCR is a limited liability corporation

13    organized under the laws of the State of Washington. SCR owns and operates SCR,

14    a large dairy Concentrated Animal Feeding Operation or "CAFO."  SCR is located

15    at or near 165 Isaacs Road, Outlook, WA 98944.

16    13.    SCR is a "person" within the meaning of Section 1004(15) of RCRA, 42

17    U.S.C. § 6903(15).

18    14.    Plaintiff Community Association for Restoration of the Environment

19    ("CARE") is a non-profit corporation organized under the laws of the State of

20    Washington. CARE's principal office is located in Outlook, Washington.

COMPLAINT                                                                    4

15.    CARE is a grassroots organization composed of concerned community members. Its mission is to inform Washington state residents about activities that endanger the health, welfare, and quality of life for current and future Washingtonians through education and citizen empowerment. CARE also acts as an advocate to protect and restore the economic, social, and environmental resources of the region. In carrying out its mission, CARE has appeared in numerous local, state, and federal proceedings.

16.    CARE's organizational purposes are adversely affected by SCR's violations of RCRA. These violations have caused significant environmental contamination of the soil and groundwater. Furthermore, but for SCR's unlawful actions, CARE would not have to spend as much of its resources on the environmental problems created by illegal discharges from individual large-scale industrial farming operations and could direct these resources to other priorities.

17.    CARE has individual members that reside in Yakima County and in proximity to the SCR. The environmental, health, aesthetic, economic, and recreational interests of CARE's members have been and will continue to be adversely affected by SCR's violations of RCRA. For instance:

      a.    Members of CARE obtain their drinking water from aquifers that have been contaminated with nitrate, phosphorus, and other pollutants, including bacteria, hormones and antibiotics, by SCR's improper

1   handling, storage, treatment, transportation, and disposal of solid and

2   hazardous waste. As a result, drinking water that CARE's members'

3   rely upon has been rendered unsafe for human consumption.

4   Consequently, CARE's members have been forced to obtain, or

5   should be obtaining but may not be able to afford, alternative sources

6   of drinking water. CARE's members are concerned that consuming

7   this water is harming or could harm them and their families' health.

8   b. Members of CARE also make domestic and agricultural use of

9   groundwater that has been contaminated with nitrate, phosphorus, and

10   other pollutants as a result of SCR's improper handling, storage,

11   treatment, transportation, and disposal of solid and hazardous waste.

12   As a result, water that CARE's members' rely upon has been rendered

13   unsafe for domestic and agricultural use. Consequently, CARE's

14   members have been forced to obtain, or should be obtaining but may

15   not be able to afford, alternative sources of water for these uses.

16   CARE's members are concerned that the water used in their homes is

17   harming them and their families' health. CARE's members are

18   concerned that the food they produce and rely upon for sustenance

19   using this water is not safe to consume.

20   c. Members of CARE also live, work, and recreate in the environment

COMPLAINT                                                                    6

that has been negatively impacted by SCR's improper handling,

storage, treatment, transportation, and disposal of solid and hazardous

waste. This has lessened CARE's members' enjoyment of their

environment. CARE's members are concerned that their environment

has been irreparably injured by SCR's improper practices.

18.     Plaintiff Friends of Toppenish Creek ("FOTC") is a nonprofit corporation organized under the laws of the State of Washington.

19.     FOTC is an organization composed of concerned community members and is dedicated to protecting the rights of rural communities and improving oversight of industrial agriculture. FOTC works through public education, citizen investigations, research, legislation, special events, and direct action. FOTC particularly devotes itself to enhancing, preserving, protecting, and monitoring the water quality of watersheds in the Yakima area.

20.     FOTC's organizational goals are adversely affected by SCR's RCRA violations. FOTC works tirelessly to protect the rights of communities against groundwater pollution caused by industrial agriculture.

21.     FOTC's members live in Yakima County and in close proximity to SCR. FOTC's members have been and continue to be injured, and their interests adversely affected, by SCR's violations. For instance:

a.  Members of FOTC obtain their drinking water from aquifers that have

1        been contaminated with nitrate, phosphorus, and other pollutants,

2        including bacteria, hormones and antibiotics, by SCR's improper

3        handling, storage, treatment, transportation, and disposal of solid and

4        hazardous waste. As a result, drinking water that FOTC's members

5        rely upon has been rendered unsafe for human consumption.

6        Consequently, FOTC's members have been forced to obtain, or

7        should be obtaining but may not be able to afford, alternative sources

8        of drinking water. FOTC's members are concerned that consuming

9        this water is harming or could harm them and their families' health.

10    b. Members of FOTC also make domestic and agricultural use of

11        groundwater that has been contaminated with nitrate, phosphorus, and

12        other pollutants as a result of SCR's improper handling, storage,

13        treatment, transportation, and disposal of solid and hazardous waste.

14        As a result, water that FOTC's members rely upon has been rendered

15        unsafe for domestic and agricultural use. Consequently, FOTC's

16        members have been forced to obtain, or should be obtaining but may

17        not be able to afford, alternative sources of water for these uses.

18        FOTC's members are concerned that the water used in their homes is

19        harming them and their families' health. FOTC's members are

20        concerned that the food they produce and rely upon for sustenance

COMPLAINT                                             8

1    using this water is not safe to consume.

2    c.    Members of FOTC also live, work, and recreate in the environment

3    that has been negatively impacted by SCR's improper handling,

4    storage, treatment, transportation, and disposal of solid and hazardous

5    waste. This has lessened FOTC's members' enjoyment of their

6    environment. FOTC's members are concerned that their environment

7    has been irreparably injured by SCR's improper practices.

8    22.    At all relevant times, Plaintiffs were and are "persons" within the meaning

9    of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

10    **STATUTORY AND REGULATORY FRAMEWORK**

11    23.    Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), provides that

12    citizens may commence a citizen suit against "any person," "including any past or

13    present generator, past or present transporter, or past or present owner or operator

14    of a treatment, storage, or disposal facility who has contributed or who is

15    contributing to the past or present handling, storage, treatment, transportation, or

16    disposal of any solid or hazardous waste which may present an imminent and

17    substantial endangerment to health or the environment."

18    24.    Section 1002(b) of RCRA states that "disposal of solid waste… in or on the

19    land without careful planning and management can present a danger to human

20    health and the environment;" and that "open dumping is particularly harmful to

COMPLAINT                                                                    9

health, contaminates drinking water from underground and surface supplies, and pollutes the air and the land….”  42 U.S.C. § 6901(b).

25.    As required by statute, EPA has promulgated criteria under RCRA § 6907(a)(3) defining solid waste management practices that constitute open dumping. *See* 42 U.S.C. § 6944(a); 40 C.F.R. Parts 257 and 258. These regulations outline certain solid waste disposal practices, which, if violated, pose a reasonable probability of adverse effects on health or the environment. 40 C.F.R. § 257.3.

26.    The purpose of RCRA is “to promote the protection of health and the environment.”  RCRA seeks to accomplish this by “prohibiting future open dumping on the land and requiring the conversion of existing open dumps to facilities which do not pose a danger to the environment or to health….”  42 U.S.C. § 6902(a)(3).

27.    Section 4005(a) of RCRA prohibits “any solid waste management practice or disposal of solid waste… which constitutes the open dumping of solid waste….” 42 U.S.C. § 6945(a).

28.    Under section 1004(3), “The term ‘disposal’ means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste… into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground-waters.”  42 U.S.C. § 6903(3).

29.    RCRA defines "solid waste" as "any garbage, refuse, sludge from a waste treatment plant… and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from… *agricultural operations*…." 42 U.S.C. § 6903(27) (emphasis added).

30.    EPA criteria for solid waste disposal practices prohibit the contamination of any underground drinking water source beyond the solid waste boundary of a disposal site. 40 C.F.R. § 257.3-4(a).

31.    An "underground drinking water source" includes (1) an aquifer supplying drinking water for human consumption or (2) any aquifer in which the ground-water contains less than 10,000 milligrams per liter of total dissolved solids. 40 C.F.R. § 257.3-4(c)(4).

32.    "Contaminate" an underground drinking water source means to cause the groundwater concentration of a listed substance to exceed its corresponding maximum contaminant level specified in Appendix I to 40 C.F.R. Part 257, or cause an increase in the concentration of that substance where the existing concentration already exceeds the maximum contaminant level in Appendix I.

33.    Under RCRA Section 7002(a)(1)(A) and (B), a suit may be brought against "any person…who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or

1    the environment." 42 U.S.C. § 6972(a)(1)(B).

2    //

3                                    **FACTS**

4    34.    SCR was founded by John Bosma, Jeff Bosma, and Brian Bosma and

5    commenced operation as SCR in 2005. Prior to 2005, the facility operated as John

6    Bosma Dairy or some other name, but was also operated as a large dairy CAFO.

7    35.    SCR owns approximately 596 acres of land at or near 165 Isaacs Road,

8    Outlook, WA 98938. SCR uses 381 acres for land applications of its nutrient,

9    process, and waste water.

10    36.    As of March 22, 2016, SCR had at least 2376 dairy cow animal units,

11    including milking cows, dry cows, heifers and calves. These animals were

12    confined 365 days per year.

13    37.    SCR is considered a large dairy CAFOs under federal and state law. 40

14    C.F.R. § 412.2; WAC 173-224-030.

15    38.    Upon information and belief, there are two main aquifers underlying the

16    SCR and the surrounding area. These aquifers include a surficial unconfined to

17    semi-confined alluvial aquifer and an extensive basalt aquifer of great thickness

18    underlying sedimentary deposits. Groundwater flows through the surficial aquifer

19    in a manner that generally follows surface topography. Groundwater flows through

20    the upper portions of the underlying basalt aquifer also generally follows surface

topography.

39.    Plaintiffs' members obtain groundwater for domestic consumption from one or both of these aquifers.

### Manure Storage Practices

40.    It is estimated that SCR generates approximately 18,000,000 gallons of liquid waste and 45,300 tons of solid waste annually.

41.    SCR composts the solid manure wastes generated by its herd on-site. Composted manure is then used as bedding at the facility.

42.    Solid Manure that is not composted by SCR is land-applied to agricultural fields.

43.    Solid manure is stored and/or composted at SCR on permeable surfaces.

44.    SCR stores the liquid manure wastes generated by its herd in one of the four manure storage lagoons. Wastes are held in these lagoons until such time as they are applied to fields through various land-application techniques.

45.    At least three of SCR's four lagoons are impoundments containing no synthetic liner or other artificial barrier.

46.    These lagoons have an estimated holding capacity of approximately 14.9 million gallons.

47.    SCR's manure lagoons are constructed above an aquifer that serves as a domestic water supply. SCR's manure storage lagoons leak to groundwater.

COMPLAINT                                                                                   13

1      48.    Upon information and belief, seepage from the manure waste storage areas

2    has been ongoing since the date these storage areas were brought into operation,

3    some more than 10 years ago, and has been continuous since put into operation.

4      49.    Public records and other data indicate that the groundwater underlying SCR

5    exceeds the Federal and State Ground Water Quality Standards for nitrate (10

6    mg/L), and that wells tested in residential wells in the area have tested in excess of

7    10 mg/L.

8      50.    The seepage of manure waste from the lagoons has contributed and is

9    contributing to the excessive contamination of the groundwater, which is posing, or

10    may pose, an imminent and substantial endangerment to health or the environment.

11      51.    SCR's storage and/or composting of solid manure on permeable surfaces

12    causes runoff and leachate from the solid manure to enter groundwater, further

13    contributing to the contamination of the groundwater.

14      52.    SCR's storage of solid and/or liquid manure in lagoons and other permeable

15    surfaces has caused and is continuing to cause the contamination of groundwater.

16      53.    Manure that has been permitted to leach, leak, or otherwise discharge into

17    groundwater, such as from a leaking lagoon, solid manure storage area, compost

18    storage area, or other permeable surface, is a "discarded material" from an

19    "agricultural operation," and is therefore a "solid waste" under Section 1004(27) of

20    RCRA, 42 U.S.C. § 6903(27).

54.   SCR's improper manure storage practices have caused irreparable injury to the environment, contaminating soils and groundwater with excessively high levels of nitrate and other pollutants.

### *Manure Application Practices*

55.   Upon information and belief, SCR and/or its agents have applied, continue to apply, and are reasonably likely to continue to apply liquid and solid manure wastes to nearby fields in amounts that exceed agronomic rates.

56.   The surface soils to which SCR applies manure have a high saturated hydraulic conductivity.

57.   Dairy effluent concentrations of ammonia and nitrate can be considerable, as ammonia is produced by hydrolysis of waste fluids. Ammonia is rapidly converted to nitrate when the manure encounters aerobic soils or groundwater. Due to their high solubility, ammonia transformed to nitrate can readily leach into groundwater.

58.   Plants can uptake nitrate and nitrite only in limited quantities. Quantities of nitrate and nitrite in the soil in excess of concentrations that can be used by the currently active crop migrate into the vadose zone, the unsaturated area between the bottom of the root zone and the water table, and then into the water table where they adversely impact ground water quality and its use as a drinking water source. Migration to the vadose zone and water table may also occur where well-drained

1   soils cannot hold the nitrate and nitrite in the root zone for a sufficient amount of

2   time to allow for the crops' natural uptake process.

3   59.    Elevated nutrient levels found in soils receiving manure are evidence of

4   manure applications in excess of agronomic rates.

5   60.    Soil tests from SCR from 2007-2010 show elevated nitrate and phosphorous

6   levels in soils receiving manure generated at SCR. Some fields tested as high as

7   249 ppm nitrate.

8   61.    Upon information and belief, the elevated nutrients found in SCR's fields

9   are evidence of applications of manure in excess of agronomic rates.

10   62.    Applications of manure waste above agronomic rates cause manure

11   nutrients, including but not limited to nitrate, to leach through soil and into

12   groundwater.

13   63.    Once nitrate enters the vadose zone, the area below the soil surface from the

14   end of the vegetative root zone to the beginning of a groundwater table, it migrates

15   down to the nearest groundwater.

16   64.     Once nitrate enters the water table, it migrates away from the SCR and into

17   the wells of nearby residents or into nearby surface waters depending upon the

18   depth and flow direction of the initial receiving groundwater.

19   65.    The contaminated shallow groundwater likely feeds surface waters such as

20   the Roza-Sunnyside Board of Joint Control Drains and the Sunnyside Canal. The

Joint Drains converge and discharge into the Granger Drain, which in turn then discharges to the Yakima River. The Sunnyside Canal discharges into the Yakima River. These waters are used by members of CARE and CFS and the general public for multiple purposes, including but not limited to recreation, human consumption, irrigation, and sustenance.

66.    Upon information and belief, the over-application of liquid manure above agronomic rates has been ongoing since the date SCR and its named predecessors were brought into operation.

67.    SCR knows or should know that applications of manure above agronomic rates – that is, applications above that which the current or planned crop can effectively utilize – will cause manure nutrients, including but not limited to nitrate and phosphorus, to pass through soils before they can be utilized by the planned or active crop and into groundwater. This renders the manure incapable of serving its intended beneficial purpose as a fertilizer.

68.    Manure that has been over-applied on fields and permitted to leach, leak, or otherwise discharge into groundwater is a "discarded material" from an "agricultural operation," and is therefore a "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27).

69.    SCR's improper manure application practices have caused irreparable injury to the environment, contaminating soils and groundwater with excessively high levels of nitrate and other pollutants.

### Contamination of Groundwater in Excess of MCLs

70.    The practices mentioned in preceding paragraphs are causing or contributing to groundwater contamination beyond the Maximum Contaminant Level ("MCL") for nitrate.

71.    The EPA has determined that nitrate poses an acute health concern at certain levels of exposure. Nitrate contained in drinking water is colorless and odorless. Ingestion of nitrates, converted to nitrite in the body, interferes with the oxygen carrying capacity of blood, potentially resulting in cyanosis and, at higher levels, asphyxia.

72.     High levels of nitrate in water can also cause a blood disorder in infants known as methemoglobinemia ("blue baby syndrome") that can be fatal if left untreated.

73.    Methemoglobinemia is a blood disorder in which an abnormal amount of methemoglobin -- a form of hemoglobin -- is produced. Hemoglobin is the molecule in red blood cells that distributes oxygen to the body. Methemoglobin cannot release oxygen. In methemoglobinemia, the hemoglobin is unable to release oxygen effectively to body tissues.

74.    High nitrate levels may also affect pregnant women and adults with hereditary cytochrome b5 reductase deficiency.

75.    In addition, nitrate and nitrite ingestion in humans has been linked to goitrogenic (anti-thyroid) actions on the thyroid gland (similar to perchlorate), fatigue and reduced cognitive functioning due to chronic hypoxia, and maternal reproductive complications including spontaneous abortion.

76.    Ingestion of nitrates in excess of the MCL is also suspected of causing various forms of cancer in the general exposed population, including a variety of carcinogenic outcomes deriving from N-nitrosamines formed via gastric nitrate conversion in the presence of amines, and compromises the health of immuno-compromised individuals and the elderly.

77.    The MCLs are health-based standards that specify contaminants known to have an adverse effect on human health at levels beyond the parameters set forth by regulations.

78.    The EPA has established that the MCL for nitrate in groundwater is 10 milligrams per liter (mg/l), or 10 parts per million (ppm).

79.    Water samples taken from residential wells surrounding SCR show elevated levels of nitrate.

COMPLAINT                                                                                          19

80.     SCR's storage and application of manure has caused nitrate contamination of these residential wells, forcing Plaintiffs' members and other residents to either consume unsafe drinking water or to obtain alternative sources of drinking water.

81.     SCR's manure storage and application practices, described in the preceding paragraphs, have caused irreparable injury to the environment, contaminating groundwater with excessively high levels of nitrate and other pollutants.

**CAUSES OF ACTION**

**Count I: RCRA Imminent and Substantial Endangerment**

82.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs of this Complaint.

83.     Since at least December of 2006, SCR, and before that its predecessors in interest, have been discarding manure which is a "solid waste" under section 1004 of RCRA, 42 U.S.C. § 6903(27), because the manure is, either when over-applied or leaked through holding areas, a discarded solid, liquid, and/or semisolid material resulting from an agricultural operation.

84.     SCR is the past and present owner or operator of a storage or disposal facility. As indicated above, manure is stored and disposed of in massive earthen pits and other holding structures. As a result, Defendant contributes to the past or present handling, storage, and disposal of a solid waste. RCRA, 42 U.S.C. § 6972(a)(1)(B).

85.     SCR is a past and present generator of manure and other by-product wastes. Manure is "handled" and "transported" by the Defendant, as well as disposed of on land owned or leased by the Defendant. *Id*.

86.     Defendant's handling, transportation, storage, and disposal of manure may present an imminent and substantial endangerment to public health and/or the environment.

87.     Specifically, as alleged above, ground and surface water contamination levels on the Defendant's land, and down-gradient and downstream from Defendant's land and facilities, have contamination levels that exceed the maximum safe consumption limits established under state and federal law, establishing a case of imminent and substantial endangerment to public health and/or the environment.

88.     The National Primary Drinking Water Standards ("NPDWS") are established under the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300f, *et seq*. The NPDWS are health-based standards that specify contaminants known to have an adverse effect on the health of persons at levels beyond the parameters set forth in the regulations. 42 U.S.C. § 300f(1)(B).

89.     The Washington Water Quality standards were promulgated to protect groundwater and human health pursuant to the Washington Water Pollution Control Act, RCW 90.48.

COMPLAINT                                                                                          21

90.     Promulgated pursuant to this statute, WAC 173-200-040(2)(a)

provides: Groundwater concentrations shall not exceed the criteria listed in Table

1, except as described in WAC 173-200-050 (3)(b). The ground-water protection

standard for nitrate is the same as the federal MCL of 10 mg/l.

91.     40 C.F.R. § 257.3-4(a) prohibits a facility or practice from contaminating an

underground drinking water source. "Contamination" occurs when a facility or

practice introduces a toxic substance that causes the concentration of that substance

in groundwater to exceed certain parameters listed in Appendix I to 40 C.F.R. §

257.3-4(a).

92.     The past and continuing practices of SCR have contaminated and continue to

contaminate groundwater to levels that exceed the maximum limits for safety

established under state and federal law. These practices present an imminent and

substantial endangerment to the environment and/or public health. Specifically,

SCR is polluting groundwater to the extent that it is hazardous to health and the

environment and the shallow contaminated groundwater is feeding nearby surface

waters including, but not limited to, Roza-Sunnyside Board of Joint Control

Drains, the Sunnyside Canal, and the Yakima River.

93.     Pursuant to RCRA Section 7003, SCR may be subject to an injunction under

RCRA ordering it to cease and abate any past or present handling, storage,

treatment, and/or transportation of any solid waste or hazardous waste that may

1  present an imminent and substantial endangerment to public health and/or the

2  environment.

3  94.   Plaintiffs' interests are harmed and will continue to be harmed by this

4  imminent and substantial endangerment and by Defendant's failure to abate the

5  endangerment unless the Court grants the relief sought herein.

6  **Count II: RCRA Illegal Open Dumping**

7  95.   Plaintiffs incorporate by reference the allegations of the preceding

8  paragraphs of this Complaint.

9  96.   SCR constitutes an "open dump" under RCRA Section 1004(14). 42 U.S.C.

10 § 6903(14).

11 97.   SCR's solid waste disposal practices cause groundwater concentration levels

12 of nitrate and other pollutants to exceed the limits set forth in Appendix I to 40

13 C.F.R. Part 257, which constitutes illegal open dumping, and is considered to pose

14 a reasonable probability of causing adverse effects to health and the environment.

15 98.   Defendant stores and disposes of manure at the facilities. The manure

16 constitutes an agricultural waste and a "solid waste" under section 1004 of RCRA

17 because it is over applied and/or improperly stored, and therefore constitutes a

18 "discarded material" under the statute. 42 U.S.C. § 6903(27).

19 99.   Groundwater monitoring data indicates that the disposal of solid wastes at

20 the SCR, including the fields SCR uses to apply manure, are causing the

1   contamination of groundwater to exceed the limits set forth in Appendix I to 40

2   C.F.R. Part 257. Concentrations of nitrate, identified herein, have repeatedly

3   exceeded the maximum contaminant levels, as documented by the EPA study. This

4   practice constitutes illegal open dumping.

5   100.    Pursuant to Section 3008, 42 U.S.C. § 6928, SCR may be subject to an

6   injunction under RCRA ordering them to cease open dumping and remediate the

7   environmental contamination they have caused and/or contributed to, including

8   widespread soil and groundwater contamination. *Id*.

9   101.    Plaintiffs' interests are harmed and will continue to be harmed by

10  Defendant's open dumping unless the Court grants the relief sought herein.

## **RELIEF REQUESTED**

12  WHEREFORE, Plaintiffs CARE and FOTC respectfully request that the Court

13  enter a judgment:

14  A.     Declaring that Defendant's past and/or present generation, handling, storage,

15  treatment, transportation, and/or disposal of solid waste presents, or may present,

16  an imminent and substantial endangerment to public health or to the environment.

17  B.     Declaring that Defendant's storage and disposal of manure and its

18  incorporated by-products constitutes illegal open dumping.

19  C.     Issuing a compliance order that requires Defendant to cease and desist from

20  storing manure on any portion of Defendant's land that the Defendant has not first

COMPLAINT                                                                          24

lined adequately with synthetic liners to prevent seepage of pollutants into surface water or groundwater that may, whether by flow or diffusion, transmit such pollutants outside Defendant's property boundaries.

D.     Issuing a compliance order that requires Defendant to capture, adequately treat, and sequester as necessary all surface water or groundwater on or within its land, except surface water that flows as the direct result of snowmelt or a precipitation event, so that discharges of such water do not cause or contribute to violation of any applicable water quality standards in any water resource that receives such discharge.

E.     Issuing temporary and/or permanent injunctive relief against Defendant, ordering Defendant to cease all activities constituting the imminent and substantial endangerment to the public health and environment, and to cease all activities constituting illegal open dumping.

F.     Issuing temporary and/or permanent injunctive relief against Defendant, ordering Defendant to design and implement a program which evaluates the actual amount of manure necessary to provide a specific crop with its anticipated nutrient needs, and to have sufficient land available, as documented in an approved Nutrient Management Plan, to handle the amount of manure produced by Defendant.

COMPLAINT                                                                                           25

G.      Issuing temporary and/or permanent injunctive relief against Defendant, ordering Defendant to design and implement a regular soil sampling protocol, such protocol to require sampling at one-foot intervals down to at least a four-foot depth, in order to prevent the ongoing migration of nitrate (and other pollutants) to the vadose zone and groundwater. Such soil sampling protocol must include soil moisture concentrations to be able to convert the soil nitrate data to concentration in the soil solution.

H.      Issuing temporary and/or permanent injunctive relief against Defendant, ordering Defendant to design and implement a groundwater monitoring program designed to detect the transport of dairy manure nutrients into groundwater.

I.      Issuing temporary and/or permanent injunctive relief against Defendant, ordering Defendant to supply clean, safe drinking water to residents located within at least three (3) miles of SCR who rely upon well water for consumption.

J.      Ordering Defendant to take all such actions as may be necessary to eliminate any present and future endangerment and open dumping practices.

K.      Ordering Defendant to pay Plaintiffs' reasonable attorneys' fees, expert witnesses' fees, and costs incurred in prosecuting this action pursuant to 42 U.S.C. § 6972(e) and 28 U.S.C. § 2412(d); and

L.      Ordering such other relief as the Court may deem just and proper, including pursuant to 42 U.S.C. § 6972(a)(1).

Dated: November 7, 2019

      Respectfully Submitted,


s/ Charles M. Tebbutt
CHARLES M. TEBBUTT
Washington Bar No. 47255
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St.
Eugene, OR 97401
Tel. 541.344.3505
charlie@tebbuttlaw.com

s/ Toby J. Marshall
TOBY J. MARSHALL
WSBA #32736
Terrell Marshall Law Group PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
tmarshall@terrellmarshall.com

s/ Andrea K. Rodgers
ANDREA K. RODGERS
WSBA #38683
Law Offices of Andrea K. Rodgers
3026 NW Esplanade
Seattle, WA 98117
andrearodgers42@gmail.com
*Counsel for Plaintiffs*

COMPLAINT                                                        27